IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA )
)
v. ) CASE NO. CR414-143
)
WILLIE CLINTON LOVETT, )
)
Defendant. )
)

ORDER

Before the Court is Defendant Willie Clinton Lovett's Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial. (Doc. 184.) For the following reasons, Defendant's motion is **DENIED**.

BACKGROUND

On August 5, 2014, Defendant, an African-American former officer in the Savannah-Chatham Metropolitan Police Department ("SCMPD") who retired after being named Chief of Police, was named in nine counts of a superseding indictment. (Doc. 109.) In the superseding indictment, Defendant was charged with one count of aiding and abetting commercial gambling in violation of 18 U.S.C. § 1955, one count of conspiracy to obstruct enforcement of state criminal laws in violation of 18 U.S.C. § 1511, five counts of extortion in violation of 18 U.S.C. § 1951, and two counts of making false statements in violation of 18 U.S.C.

§ 1001. (Id.) Defendant elected to proceed to trial, which was held from November 17 to 21, 2014.

At the beginning of the trial, the Court randomly selected thirty-two individuals to form a jury panel, from which the parties would ultimately select twelve jurors and two alternate jurors. After conducting a voir dire examination and excusing seven potential jurors for cause, the thirty-two member panel consisted of seven African-Americans. Of those seven, two African-Americans were chosen for the twelve-member jury.

At the conclusion of jury selection, Defendant challenged the Government's preemptory challenges as improperly based on potential jurors' race. Defendant argued that the Government using five of its seven strikes to remove African-American jurors established a prima facie case of discriminatory jury selection under Batson v. Kentucky, 476 U.S. 79 (1986), and required the Government to provide race-neutral reasons for striking those jurors. The Court disagreed, reasoning that merely identifying the Government's use of all but two of its strikes on African-American jurors was insufficient to establish a prima facie case of discrimination under Batson. After stating its position, the Court asked Defendant if there was "any other argument you want to make or any other law that you want to

cite to the Court other than what you've done." Defendant declined the Court's invitation.

During the five-day jury trial, the Government presented twenty-four witnesses and approximately one hundred and fifty exhibits. Among the witnesses were the owner of the illegal gambling operation, co-Defendant Randall Wayne "Red" Roach; several law enforcement officers; and a paid informant who operated one of Mr. Roach's illegal gambling games. Their testimony and the associated evidence suggested that Defendant, both prior to and while serving as Chief of the SCMPD, accepted payment from Mr. Roach in exchange for protecting the operation from local law enforcement. At the conclusion of the trial, Defendant was convicted on each count of aiding and abetting commercial gambling and conspiracy to obstruct enforcement of state criminal laws; both counts of making false statements; and two of the five counts of extortion. (Doc. 175.)

As part of his request for acquittal, Defendant contends that the Government failed to present any evidence that Defendant actually obstructed the enforcement of state criminal laws. (Doc. 184 at 2-7.) According to Defendant, the Government's evidence establishes that the decision not to make any arrests for illegal gambling was made by the

3

responding officers prior to any involvement by Defendant. (Id.) Also, Defendant argues that the Government failed to offer at trial any evidence that the alleged extortion payments had any effect on interstate commerce. (Id. at 7-9.) Finally, Defendant reasons that the Government did not offer any evidence that would establish Defendant's alleged false statements were made within the Southern District of Georgia. (Id. at 9-10.)

With respect to his request for a new trial, Defendant argues that he is entitled to a new trial because the Court incorrectly denied his Batson challenge. (Id. at 10-14.) According to his motion, Defendant maintains that the Government's decision to exercise five of its seven strikes against African-American potential jurors established a prima facie case under Batson and required the Government to provide race-neutral reasons for those strikes. (Id. at 12-14.) Defendant contends that the Court denied his Batson motion solely on the basis that Defendant used all of his strikes to remove white potential jurors. (Id. at 13.)

In its response, the Government argues that it presented ample evidence from which a reasonable jury could conclude that Defendant aided and abetted commercial gambling, and conspired to obstruct the enforcement of state criminal laws. (Doc. 185 at 2-5.) With respect to the

extortion counts, the Government contends that it presented sufficient evidence to permit the jury to find that the transactions had at least a minimal effect on interstate commerce. (Id. at 5-7.) In addition, the Government points to evidence that establishes Defendant made the false statements within the Southern District of Georgia. (Id. at 7-8.) Finally, the Government maintains that Defendant failed to establish even a prima facie Batson challenge, which is a prerequisite for requiring the Government to provide race-neutral reasons for its strikes. (Id. at 8-11.)

**ANALYSIS**

I. DEFENDANT'S REQUEST FOR ACQUITTAL

In assessing a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the Court must determine if the evidence presented at trial would allow a reasonable jury to find, beyond a reasonable doubt, that the defendant committed the elements of a charged offense. United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). The evidence must be viewed in the light most favorable to the Government, with all reasonable inferences and credibility determinations resolved in the Government's favor. Id. After reviewing the evidence in this case, the Court concludes that Defendant is not

5

entitled to a judgment of acquittal with respect to any of the counts for which he was convicted.

A. <u>Aiding and Abetting Commercial Gambling, and Conspiracy to Obstruct State Criminal Laws</u>

First, the Government presented ample evidence that would permit a reasonable jury to conclude Defendant aided and abetted commercial gambling and conspired to obstruct state criminal laws. For his part, Defendant selectively points to the testimony of officers who responded to complaints regarding Mr. Roach's illegal gambling operation. Defendant characterizes their testimony as establishing that the decision not to investigate the illegal gambling operation was made prior to any involvement by Defendant. Based on this testimony, Defendant reasons that he neither aided or abetted commercial gambling, nor conspired to obstruct state criminal laws because he did not influence the responding officers' decisions to decline further investigation of possible illegal gambling.

However, Defendant takes this testimony out of context and ignores the avalanche of evidence to the contrary. While the Court will not provide an exhaustive list, the following examples are illustrative of the abundance of evidence suggesting that Defendant both aided and abetted

commercial gambling and conspired to obstruct state criminal laws. For example, several law enforcement officers involved with investigating illegal gambling testified at trial regarding Defendant's involvement. In addition, the owner of the illegal gambling operation, along with two of his employees, similarly testified as to Defendant's role.

Kevin Ryan testified that he encountered Defendant while conducting an undercover investigation of Mr. Roach's illegal gambling operation. Defendant, then a Major with the SCMPD, was in uniform standing approximately twenty feet from the operation. When Defendant spotted Mr. Ryan,[1] Defendant interrupted Mr. Ryan's undercover investigation by "thr[owing] himself on the table, push[ing] the balls back toward the operator, push[ing their] money back . . . , and [saying] 'no, no. They closed. They're closed.' " Based on Defendant's actions, Mr. Ryan ended his investigation of Mr. Roach's gambling operation.

Additionally, Detective Roy Coleman testified that Defendant, then Chief of SCMPD, was present while Detective Coleman was investigating one of Mr. Roach's gambling operations. According to Detective Coleman, Defendant told

---

[1] At that time, Mr. Ryan served as a police officer in the SCMPD. At the time of trial, Mr. Ryan had left the SCMPD and was employed in private security.

him that he knew Mr. Roach. When asked at trial whether Detective Coleman made any arrests for illegal gambling, he stated that he "knew [it] wasn't going to happen that day" because he "knew that [Defendant] was there for a reason. He'd been called there." Officer David Lane similarly testified that Defendant's involvement in one of his investigations of Mr. Roach resulted in Officer Lane's decision to end the investigation without making any arrests. In this instance, Mr. Roach informed Officer Lane that he was on the phone with Defendant, who was going to send over an officer named Captain Phillips to "handle the situation." When asked if this affected his investigation Officer Lane testified that

> when [Captain Phillips] responded, yes, I felt like it was kind of out of my hands at that point. Even though I was trying to handle it the way I was going to handle it, I felt like it was above my pay grade, that there must be somebody that was approving it over me. So it did affect my decision.

The Government also introduced testimony from Mr. Roach's game operators that supports the jury's conclusion that Defendant was involved in commercial gambling and conspired to obstruct state criminal laws. Emerson Healy, who was responsible for enticing individuals to begin playing the gambling games, testified that he witnessed on several occasions Mr. Roach paying Defendant. In addition,

Mr. Healy testified that police presence, either in the form of Defendant or any other officer, was not a concern such that neither Mr. Roach nor any of the game operators would attempt to conceal the illegal gambling operation from law enforcement. William Holtz, a long-time game operator for Mr. Roach, similarly testified that Defendant "knew it was gambling," but that it was not a problem because "we were paying him." Referencing the incident investigated by Detective Coleman, Mr. Holtz testified that no arrests were made on that occasion and that they were paying Defendant for "protection." Even Mr. Roach, the owner of the illegal gambling operation, testified at length how he would pay Defendant to ensure that his operation continued unhindered by local law enforcement.

As noted above, these examples are not an exhaustive list of the evidence presented to the jury. Needless to say, the Government presented a copious amount of evidence from which a reasonable jury could find Defendant guilty of both aiding and abetting a commercial gambling operation, and conspiracy to obstruct the enforcement of state criminal laws. As a result, Defendant's request for acquittal with respect to these charges must be **DENIED**.

B.  Extortion

With respect to the charges of extortion, Defendant argues that he is entitled to a judgment of acquittal because the Government failed to prove that Defendant's acts delayed, interrupted, or affected interstate commerce. (Doc. 184 at 8.) Defendant's actions need only have had a minimal effect on interstate commerce. United States v. Verbitskaya, 406 F.3d 1324, 1335 (11th Cir. 2005) (citing United States v. Woodruff, 296 F.3d 1041, 1049 (11th Cir. 2002)). In this case, the Government easily proved that Defendant's extortionate acts met this standard. For example, Mr. Holtz testified that he ran illegal gambling games for Mr. Roach in both South Carolina and Georgia. The interstate nature of the illegal gambling operation is in itself sufficient to establish that Defendant's actions affected interstate commerce. See United States v. Jackson, 748 F.2d 1535, 1537 (11th Cir. 1984) (" '[C]ommerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion . . . .' " (quoting U.S. v. Elders, 569 F.2d 1020, 1025 (7th Cir. 1978))). Accordingly, Defendant's request for acquittal with respect to the charges of extortion must be **DENIED**.

C.  Making False Statements

Defendant contends that the Government failed to prove that either of his false statements was made within the Southern District of Georgia, thus depriving this Court of jurisdiction over these charges. (Doc. 184 at 9-10.) This argument, however, clearly ignores the trial testimony of Agent Adam Rogalski of the Federal Bureau of Investigation. At trial, Agent Rogalski testified that both of the interviews during which Defendant made the false statements for which he was convicted took place at Defendant's residence "located on Talahi Island in Savannah." Of course, Savannah is within the Southern District of Georgia. To the extent that this fact was not conclusively established during trial, this Court takes judicial notice that Talahi Island is located within the Southern District of Georgia. See United States v. Greer, 440 F.3d 1267, 1272 (11th Cir. 2006) (noting use of judicial notice to establish venue); see also United States v. Males, 715 F.2d 568, 569-70, n.2 (11th Cir. 1983) (holding that despite no direct testimony that crime occurred in Dade County, Florida, venue was established because there were sufficient references to crime taking place in Miami, and stating that court can, post-trial, take judicial notice of Miami's location in Dade County). Accordingly, Defendant's

11

request for a judgment of acquittal with respect to the charges of making false statements must be **DENIED**.

II. <u>DEFENDANT'S REQUEST FOR A NEW TRIAL</u>

Defendant argues that he is entitled to a new trial because the Court failed to require the Government to provide race-neutral reasons for the five African-American jurors it struck from the jury panel. (Doc. 184 at 10-14.) According to Defendant's version of events, the Court declined to place this burden on the Government because Defendant used all of his strikes against white jurors. (<u>Id.</u> at 13.) Federal Rule of Criminal Procedure 33(a) permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." The decision whether to grant a new trial is left within the sound discretion of the trial Court. <u>United States v. Champion</u>, 813 F.2d 1154, 1170 (11th Cir. 1987).

In <u>Batson</u>, the Supreme Court of the United States determined that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection." 476 U.S. 79, 86 (1986). To protect this right, that Court established a three-part test to determine whether a party's use of a preemptory strike was improperly motivated by racial or ethnic discrimination. <u>United States v. Ochoa-Vasquez</u>, 428 F.3d 1015, 1038 (11th

Cir. 2005) (citing Batson, 476 U.S. at 79). First, the party challenging the preemptory strike must establish a prima facie case of discrimination by presenting facts sufficient to support an inference of racial discrimination. Id. If that party makes a prima facie showing, the party exercising the challenged strike must then articulate a race-neutral reason for striking that juror. Id. Finally, the trial court must then determine the merit of the race-neutral reason and whether the challenging party has carried its burden of proving improper discrimination. Id. at 1038-39. However, " 'the establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike.' " Id. (quoting Cent. Ala. Fair Hous. Ctr. v. Lowder Realty Co., 236 F.3d 629, 636 (11th Cir. 2000)).

In determining whether the challenging party has established a prima facie case of discrimination, the Court looks to all the relevant circumstances. Id. at 1044. The mere striking of a particular racial set of jurors does not necessarily raise an inference of racial discrimination. Id. (quoting Lowder, 236 F.3d at 636). For example, "the number of persons struck takes on meaning only when coupled with other information such as the racial composition of

13

the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." Lowder, 236 F.3d at 636-37 (emphasis in original); accord United States v. Novaton, 271 F.3d 968, 1002 (11th Cir. 2001) (same); United States v. Allen-Brown, 243 F.3d 1293, 1298 (11th Cir. 2001) (evaluating the strike pattern in light of the racial composition of remaining potential jurors); United States v. Stewart, 65 F.3d 918, 925 (11th Cir. 1995) (stating that "no particular number of strikes against blacks automatically indicates the existence of a prima facie case," and considering, inter alia, the number of struck black jurors as a percentage of the black venire members).

In this case, Defendant failed to establish a prima facie case that the Government improperly struck potential jurors based on their race, thus obviating the need for the Government to provide race-neutral reasons for those strikes. The Government did not use all seven of its strikes on African-American potential jurors and this Court concludes that using five out of seven strikes against individuals of a certain race does not, standing alone, give rise to an inference of discrimination. Moreover, the Government could have employed its seven strikes to eliminate all African-Americans from the final jury.

Instead, the Government exercised two of its strikes against white potential jurors, which resulted in two African-Americans serving on the final jury. Leaving these individuals on the jury, despite its ability to remove them, indicates a lack of discriminatory motive on the part of the Government.

Statistically, the composition of the randomly selected jury panel and the final jury show a lack of discriminatory motive. The final thirty-two member jury panel consisted of twenty-four white, one Asian, and seven African-American jurors. Based on these numbers, African-Americans represented 22% of the jury panel. After the striking process, the final jury consisted of ten whites and two African-Americans. Therefore, African-American jurors accounted for 17% of the final jury. Comparing these two numbers illustrates that African-American representation in the final jury closely reflected their representation in the jury panel.

To be clear, Defendant still could have attempted to argue at trial discriminatory motive on the part of the Government. As the Court noted at that time, however, the mere fact that the Government used five of its seven strikes on African-American potential jurors was woefully insufficient to establish a prima facie case and require

the Government to provide race-neutral reasons for those strikes. Standing alone, the data fails to indicate discriminatory motive on the part of the Government in removing potential jurors. See United States v. Hill, 643 F.3d 807, 839 (11th Cir. 2011) ("Of course, the prima facie case determination is not to be based on numbers alone but is to be made in light of the totality of the circumstances." (citing Johnson v. California, 545 U.S. 162, 168 (2005))).

At trial, the Court provided Defendant every opportunity to establish a prima facie case, finally asking if "there [was] any other argument you want to make or any other law that you want to cite to the Court." However, Defendant offered no argument concerning the circumstances surrounding the Government's use of its strikes, the percentages of African-American in the final jury compared to the jury panel, or the similarity between struck African-American potential jurors and white jurors that were selected for the final jury. Rather, Defendant elected to stand by his argument that simply using five of seven strikes established a prima facie case under Batson. Defendant was wrong then and has subsequently offered no argument to convince this Court otherwise.

Finally, the Court wishes to address Defendant's argument that it denied his Batson challenge simply because Defendant used all of his strikes on white jurors. Defendant's conclusion is mere speculation that he attempts to support by selectively removing some of this Court's statements from the context of the overall discussion regarding his Batson challenge. As an initial matter, at no point during argument on Defendant's Batson challenge did the Court state that it was denying Defendant's challenge simply because he struck only white potential jurors. In fact, the Court stated that it did not think Defendant "showed a prima facie case that there's some, you know, improper motive on the Government's part in striking the ones that they struck just by saying the five-out-of-seven ratio." The Court did note the irony of Defendant advancing his ratio argument in light of the fact he used all eleven of his strikes to remove white potential jurors, but that in no way formed the basis of the Court's conclusion that Defendant failed to establish a prima facie case under Batson. To argue otherwise misrepresents the record in an attempt to create error where none exists. Accordingly, Defendant's request for a new trial is **DENIED**.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial (Doc. 184) is **DENIED**.

SO ORDERED this 30th day of January 2015.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA